UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Christine L.,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>Martin O'Malley,<br>Commissioner of the<br>Social Security Administration,<br><br>　　　　　　　Defendant. | Civil No. 3:23-cv-00733-MPS<br><br><br><br><br>April 22, 2024 |

**RECOMMENDED RULING ON PENDING MOTIONS**

The plaintiff, Christine L.,[1] seeks review of the final decision of the Commissioner of Social Security ("the Commissioner"), denying her application for Title II Disability Insurance benefits and disabled widow's benefits. (Compl., ECF No. 1.) Representing herself at this court, she filed a motion "asking to remand" her case to the agency. (ECF No. 27.) The Commissioner filed a cross motion to affirm the decision denying her benefits. (ECF No. 28.) The presiding District Judge, the Honorable Michael P. Shea, referred both motions to me – United States Magistrate Judge Thomas O. Farrish – for recommended rulings. (ECF No. 12.)

The Court reviews Social Security disability determinations on a limited basis. It cannot ignore the Commissioner's earlier decision, consider all the evidence in the record anew, and declare that a plaintiff is or is not disabled. Rather, when a disability claimant appeals, this Court's

---

[1]　　Pursuant to the Court's January 8, 2021 Standing Order, the Plaintiff will be identified solely by first name and last initial throughout this opinion. *See* Standing Order Re: Social Security Cases, No. CTAO-21-01 (D. Conn. Jan. 8, 2021).

1

job is simply to review the record and decide if it contains "substantial evidence" to support the Commissioner's reasoning, or if the Commissioner's decision reflects an error of law. Since the Court does not re-decide the basic issue of disability, it does not re-weigh the evidence. That is, it does not consider whether there is *more* evidence on one side or the other. It only reviews the record to determine if it contains relevant evidence that supports the conclusions the Administrative Law Judge ("ALJ") already made. If so, the Court must affirm, even if it might have weighed the evidence differently in the ALJ's shoes.

For example, in his decision denying the plaintiff's application, ALJ Louis Bonsangue wrote that the plaintiff "had 'no difficulty' . . . doing heavy household chores." (R. 18.) The plaintiff says that this is "not correct," and that she can't even "do dishes long without having severe pain." (ECF No. 27, at 1.) But the Court does not decide if the plaintiff can do heavy household chores or not; it only determines if there is something of substance in the record that supports the ALJ's conclusion on that topic. Here, the plaintiff testified that her "son-in-law. . . usually comes over to help" when she needs to lift something. (R. 38.) She had to go to the doctor due to "[w]orsening of chronic back pain" after moving, even though her "[f]riends help[ed] with [the] heavy lifting." (R. 698.) She actually reported "moderate difficulty" with heavy household chores at her initial Occupational Therapy appointment. (R. 667.) But her Occupational Therapy Discharge Summary, issued on March 19, 2021, reflects that she reported "[n]o difficulty" with "heavy household chores," as the ALJ said. (R. 755.) This is relevant evidence of substance that supports the ALJ's conclusion.

As discussed below, because there is substantial evidence to support the Commissioner's decision, I recommend that the plaintiff's motion to remand be **DENIED** and that the Commissioner's motion to affirm be **GRANTED.**

I.      FACTUAL AND PROCEDURAL BACKGROUND

On November 10, 2020, the plaintiff applied for Social Security disability benefits and ten days later, on November 20, she applied for disabled widow's benefits. (R. 15, 293.) She alleged that she suffered from "[b]ack problems, [p]roblems with [her] left elbow (possibly arthritis), [p]roblems with [her] right leg, [and m]igraines" that prevented her from working, beginning on March 23, 2020. (R. 108, 293.) In December 2020, she reported that she could "not lift or carry over 10 lbs." or "walk more than 5 to 10 min[utes] with[out] being in pain" because of these impairments. (R. 396.) She also stated that "sitting to[o] long hurt [her] lower spine and back of knees," that she "get[s] migraines often," and that she suffered from "severe pain in [her left] elbow" and "neck and lower part of skull." (*Id.*) In September 2021, she indicated that her "r[igh]t elbow [and] shoulder hurt all the time" and that she was beginning to "get pain going down [her right] leg and [her] left hip." (R. 418.) By this time, "[e]ven driving for long periods [was] bothering" her and she was unable to hold her neck in a fixed position "long without pain." (*Id.*) She further reported losing concentration and her balance. (R. 424.)

This was not her first application for disability benefits; a prior application filed on November 10, 2015, was denied on February 28, 2018. (R. 83, 93.) This time, her claims were denied in two notices, both dated March 22, 2021. (R. 135–44.) Her requests for reconsideration were likewise denied on November 22, 2021 (R. 153, 158), and on December 6, 2021, she requested a hearing before an ALJ. (R. 162.) The agency scheduled the hearing for March 2, 2022, to be held via telephone due to the "COVID-19 national public health emergency." (R. 277, 279.)

At the hearing, the plaintiff was represented by Ms. Tatsha Edwards of Quikaid (R. 33, 284–87). The plaintiff testified that she can drive herself "to and from errands or to and from

doctor's appointments" and that she generally does not need help with "daily chores," but that her son "usually comes over to help" her if she needs to lift anything. (R. 38.) She told the ALJ that since "September of 2017," she has been working as an Uber driver. (R. 40–41.) While noting that it "was really hard on her," she described nevertheless driving "anywhere from 12 to 14 to sometimes 16 hours a day." (R. 41.) She denied helping passengers with their luggage or doing any heavy lifting while performing this work. (R. 43.)

As regards her impairments, she claims she once used a cane but that she stopped using it after her "pastor told [her she] didn't need it." (R. 46.) She told the ALJ that she goes grocery shopping "two or three times a week when [she] absolutely need[s] stuff, . . . because [she] can't carry a lot." (R. 46–47.) She explained that even these short shopping trips cause her "excruciating pain" "by the time [she] get[s] back to [her] car." (R. 47.) To control this pain, she uses "ibuprofen" and a "TENS unit that [she] use[s] when [she is] driving a lot." (R. 48.) She testified that she can only lift up to "seven pounds" without "pay[ing] for it later." (R. 50.) She also indicated that she suffers from "sciatica" and "numbness or tingling" from the "buttocks down to [the] knee." (*Id.*) She described refusing a "spinal shot" because of a prior adverse reaction to the same treatment. (R. 51.) The plaintiff also testified that she suffers from migraines and pain in her left elbow, right knee, and feet. (R. 52–54.) While she mentioned hand pain at the hearing, she denied any medical diagnosis of "carpal tunnel or any type of arthritis in [her hands]." (R. 58.)

After the hearing, ALJ Bonsangue followed the five-step process that is required in Social Security claims, described in detail in Section III below, and concluded that the plaintiff had "not been under a disability, as defined in the Social Security Act, from March 23, 2020," through March 29, 2022, the date of his written decision. (R. 24.) At step one, he found that she had "[n]ot engaged in substantial gainful activity since March 23, 2020, the alleged onset date" of her

4

disability. (R. 18.) At step two, he determined that she suffered from two severe impairments that "significantly limit the ability to perform basic work activities," namely, "degenerative disc disease of the lumbar spine [and] osteoarthritis of the right knee." (*Id.*) He did not find that those impairments "meet[] or medically equal[] the severity of one of the listed impairments" at step three, and so he proceeded to determine her residual functional capacity, or "RFC." (R. 19.) After considering "the entire record," he found that the plaintiff was able "to perform sedentary work" generally, but imposed additional limitations, such as a prohibition on "climb[ing] ladders, ropes, or scaffolds" and "concentrated exposure to vibration and . . . to unprotected heights and heavy machinery." (R. 19–20.) Finally, he determined at step four that even with the additional limitations, the plaintiff was "capable of performing past relevant work as a telephone solicitor," and was therefore not disabled. (R. 23–24.) After the Appeals Council denied the plaintiff's request for review of the ALJ's decision (R. 1–3), that decision became final and appealable to this court.

The plaintiff filed her complaint on June 5, 2023, appealing the administrative decision of the Commissioner. (Compl., ECF No. 1.) Proceeding *pro se* – that is, representing herself without an attorney – she filed her motion to remand on October 5, 2023, after the Court granted her one extension of time to do so. (ECF No. 27.) In her *pro se* motion, she challenges specific factual findings made by the ALJ and asks that the case be remanded for further proceedings. The Commissioner filed his motion to affirm on November 6, 2023, arguing that substantial evidence supports the ALJ's decision and it should thus be affirmed. (ECF No. 28.) The plaintiff's November 20, 2023 deadline for filing a reply brief has passed. (*See* ECF No. 24.) The motions are now ripe for decision.

## II. LEGAL STANDARD

Under the Social Security Act, disability insurance benefits are available to claimants who are "under a disability" and fulfill other requirements. 42 U.S.C. § 423(a). The Social Security regulations define disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." 20 C.F.R. § 404.1505(a).

The surviving divorced spouse of a "person who died fully insured" may also be "entitled to widow's or widower's benefits" under the Social Security regulations. 20 C.F.R. § 404.336. Claimants seeking disabled widow's benefits must show they were validly married for at least ten years before divorcing. 20 C.F.R. § 404.336(a). They must be "at least 50 years old and have a disability as defined in § 404.1505," the same standard that applies to disability insurance benefits. 20 C.F.R. § 404.336(c). Since a surviving divorced spouse need not show a disability to be entitled to benefits if she is over sixty years old, the qualifying disability must have begun prior to the month in which the claimant turns sixty. *See id.*

Because the standard for finding that a claimant is under a disability is the same for disability insurance benefits and disabled widow's benefits, the Commissioner follows the same five-step process to determine if claimants are disabled and therefore entitled to either or both. At Step One, the ALJ determines "whether the claimant is currently engaged in substantial gainful activity." *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008)). To be found non-disabled at this step, the claimant must be performing work that is "both substantial and gainful," with "substantial" defined in the SSA regulations as "work activity that involves doing significant physical or mental activities," and "gainful" defined

6

as work done "for pay or profit." 20 C.F.R. § 404.1572. The regulations add that if the claimant's average monthly earnings fall below a specified threshold, the SSA will regard her as "not engaged in substantial gainful activity" even if she does some work. 20 C.F.R. § 404.1574. Thus, a claimant can do some work – and earn a small amount of money – and still not be disqualified at this step. *See, e.g., Jose G. v. Kijakazi*, No. 3:21-cv-1434 (TOF), 2022 WL 3593702, at *1 (D. Conn. Aug. 23, 2022). But an "ALJ may consider a claimant's past work" in assessing disability at the later steps of the process, "even if the earnings from that work fall below the guidelines." *Parker v. Astrue*, No. 1:06-cv-1458 (GLS/VEB), 2009 WL 3334341, at *3 (N.D.N.Y. Oct. 14, 2009).

At Step Two, the ALJ considers the claimant's "medically determinable impairments" and analyzes whether one or more are "severe." *McIntyre*, 758 F.3d at 150. A "medically determinable impairment" is one that results from "anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. §§ 404.1521, -416.921. "If an impairment is not medically determinable, then it cannot be 'severe' at step two." *Cooper v. Comm'r of Soc. Sec.*, No. 17-cv-1058 (MJR), 2019 WL 1109573, at *4 (W.D.N.Y. Mar. 11, 2019) (citing *Keller*, 2017 WL 4112024, at *12).

While the regulations governing Step Two do not contain an express definition of "severe," they do define "non-severe impairment[s]," and thus they define severity by negative implication. *Larkin v. Astrue*, No. 3:12-cv-0035 (WIG), 2013 WL 4647243, at *5 (D. Conn. Apr. 29, 2013), *report and recommendation adopted in part, rejected in part on other grounds,* No. 3:12-cv-35 (MPS), 2013 WL 4647229 (D. Conn. Aug. 29, 2013). "An impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1522(a); *see also* SSR 96–3p, 1996 WL 374181, at

\*1 (S.S.A. July 2, 1996). Impairments that are "not severe" must be only a slight abnormality that has no more than a minimal effect on an individual's ability to perform basic work activities. *Id. at \*1.* Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering job instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. 20 C.F.R. § 404.1522(b).

At Step Three, the ALJ evaluates whether the claimant's impairment "meets or equals the severity" of one of the "Listings" – that is, the specific impairments listed in 20 C.F.R. Part 404, Subpart B, Appendix 1. *McIntyre*, 758 F.3d at 150. At that step, the ALJ considers the severity of the impairment, without regard to vocational factors. *See* 20 C.F.R. § 404.1525(a) (describing Listings as "impairments that we consider to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience"). "A claimant who satisfies a Listing at Step Three is entitled to benefits, and the evaluation of [her] claim ends there." *Kujtim M. v. Kijakazi*, No. 3:21-cv-205 (TOF), 2022 WL 2965621, at \*3 (D. Conn. July 27, 2022). Listed impairments are purposefully set at a high level of severity because "the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary." *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). When a claimant meets or equals a Listing, "[s]he is presumed unable to work and is awarded benefits without a determination whether [s]he actually can perform [her] own prior work or other work." *Id.; see also Petrie v. Astrue,* 412 F. App'x 401, 404 (2d Cir. 2011) (summary order) (observing that Step Three is "based solely on medical evidence," and if the claimant meets her burden she is "*per se* 'disabled' and thus presumptively qualified for benefits"). Listed impairments set such strict standards because they essentially end the five-step inquiry, before residual functional capacity is even considered. *See Bowen v. Yuckert*,

482 U.S. 137, 153 (1987) ("[S]tep three streamlines the decision process by identifying those claimants whose medical impairments are so severe that it is likely they would be found disabled regardless of their vocational background.").

If the claimant is not found disabled at Step Three, the ALJ then assesses her RFC and uses that assessment at Step Four to determine whether she can perform any of her "past relevant work." A claimant's RFC is "the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545. The regulations oblige the SSA to assess RFC "based on all the relevant evidence in [the claimant's] case record," *id.,* and they define "past relevant work" as "work that [the claimant has done] within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it." 20 C.F.R. § 404.1560. Taken together, the definitions of RFC and "past relevant work" require the ALJ to consider, at Step Four, whether the claimant has the functional ability despite her limitations to perform substantial gainful work that she did within the prior fifteen years.

Finally, if the claimant cannot perform any past relevant work, at Step Five the ALJ considers "whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's [RFC], age, education, and work experience." *Id.* The claimant bears the burden of proof through the first four steps, but at the fifth step, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 445 (2d Cir. 2012) (per curiam). If the claimant shows she is unable to perform past work due to a severe impairment and the Commissioner does not show the claimant is able to perform alternative work, the claimant is disabled.

The court reviews decisions of the Commissioner to determine if they are supported by substantial evidence and free of legal error. *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) ("A

district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error.") (internal quotation marks omitted). In Social Security appeals, the district court is "performing an appellate function," and the Commissioner's findings of "fact, if supported by substantial evidence, [are] conclusive." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981); 42 U.S.C. § 405(g). The standard is deferential; though "more than a mere scintilla," substantial evidence means only "such relevant evidence as a reasonable mind might accept as adequate." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (internal quotation marks and citations omitted).

A different standard applies to the Commissioner's conclusions of law. The Second Circuit has observed that, "[w]hen there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987). Even if the Commissioner's decision is supported by substantial evidence, "an error of law . . . that might have affected the disposition of the case . . . is grounds for reversal." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004). In these situations, the court should "remand the case. . . in order to ensure that the correct legal principles are applied." *Johnson*, 817 F.2d at 986.

## III. DISCUSSION

The plaintiff is representing herself in her appeal of the Commissioner's decision and, for that reason, the Court reads her motion more flexibly than it might read a motion prepared and submitted by an attorney. The Second Circuit Court of Appeals has repeatedly instructed that self-

represented parties are "entitled to 'special solicitude'" and that their "submissions must be construed 'liberally[]' . . . [and] read to raise the strongest arguments they 'suggest.'" *E.g., Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) (citations omitted).

As noted above, the Court may only overturn a decision of the Commissioner if it finds that it is not supported by substantial evidence or that the ALJ made a legal error that may have affected the outcome. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (observing that the Court "may only set aside a determination which is based upon legal error or not supported by substantial evidence"). That said, a self-represented plaintiff need not actually recite the words "substantial evidence" or "legal error" in her motion to obtain review of her claims. Rather, her "[f]actual allegations alone are what matters." *Albert v. Carovano*, 851 F.2d 561, 571 (2d Cir. 1988) (citing *Newman v. Silver*, 713 F.2d 14, 15 n. 1 (2d Cir.1983). The Court cannot "cannot invent factual allegations that [the plaintiff] has not pled," *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010), but if it can make out a claim of a lack of substantial evidence or legal error based on the facts the plaintiff has alleged, it will address that claim even if the plaintiff did not know the precise legal term for it.

In her motion, the plaintiff argues that "the [ALJ's] decision was not correct" because there are "a lot of mistakes that need to be addressed" in the March 29, 2022 decision. (ECF No. 27, at 1.) She disputes that decision by challenging specific factual findings, going so far as to claim she "strongly believe[s] someone has [her] case mixed up with someone else's because there is so much in there that is not correct." (*Id.* at 2.) Even when reading her motion with the "special solicitude" due to a *pro se* litigant, I do not observe a claim of legal error. But I do find she has alleged that the ALJ's decision was not supported by substantial evidence.

11

So long as the ALJ's factual findings are supported by substantial evidence, this Court cannot overturn them. *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982) ("[T]he factual findings of the Secretary, if supported by substantial evidence, shall be conclusive.") (citing 42 U.S.C. §§ 405(g), 1383(c)(3)). This is a highly deferential standard. It does not require that the record overwhelmingly support the ALJ's decision; it does not even require that the record *mostly* support the decision. *See id.* (noting "a simple reality which appellants often overlook, namely, that factual issues need not have been resolved by the Secretary in accordance with what we conceive to be the preponderance of the evidence"). Substantial evidence just means enough evidence that a reasonable person could find themselves agreeing with the ALJ, or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (quotation marks and citation omitted).

The Court cannot reverse the Commissioner's decision or remand the matter just because the record also contains evidence that would support the plaintiff's position. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (quoting *Schauer v. Schweiker,* 675 F.2d 55, 57 (2d Cir.1982)) ("Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence."). And "[s]ubstantial evidence need not *compel* the Commissioner's decision." *Soler v. Colvin*, No. 3:13-cv-1659 (SRU), 2015 WL 4999790, at *1 (D. Conn. Aug. 21, 2015) (emphasis added). Rather, the "court must consider the entire record, examining evidence from both sides," *Soler*, 2015 WL 4999790, at *1, and determine if there is "more than a touch of proof here and there" to support the Commissioner's findings, whether or not there is also evidence that may contradict them. *Williams*, 859 F.2d at 258.

Applying this standard, I conclude that the ALJ's decision is supported by substantial evidence. Some of the plaintiff's arguments appear to be based on a misreading of his decision, but others dispute the accuracy of some findings and therefore call into question whether there is substantial evidence in the record to support them. I will first attempt to clear up any points of confusion, and then I will consider whether the challenged findings have substantial evidentiary support in the record.

The plaintiff first claims that the ALJ incorrectly stated the date on which her disability began. (ECF No. 27, at 1.) She writes that her "disability started on December 6, 2013, . . . not on November 3, 2020." (*Id.*) While there is evidence that the plaintiff has claimed an "[a]lleged onset date of 12/06/2013," (R. 351), she is mistaken when stating that the ALJ found that her disability began on November 3, 2020. Rather, he found that November 3, 2020, was the day that she first became potentially eligible for disabled widow's benefits, that is, "the date the wage earner" – her ex-husband – "died." (R. 16.) And there is evidence in the record that supports the finding that her ex-husband died on that date. (R. 294.)

Next, the plaintiff evidently contends that the ALJ got the dates of her physical therapy wrong. (ECF No. 27, at 1) (citing R. 18, in which the ALJ had mentioned a date of December 2, 2020, and contending that she attended physical therapy from January 2014 to January 2022). But when the ALJ referenced the 2020 date, he was talking about *occupational* therapy, not *physical* therapy. (R. 18.) And his statement that the plaintiff "was referred to occupational therapy on December 2, 2020" has substantial evidentiary support in the record. (*See* R. 767) ("Occupational Therapy Initial Evaluation Plan of Care," indicating that the plaintiff began occupational therapy on December 3, 2020).

Several of the plaintiff's later challenges can be addressed together because the substantial evidence that supports the ALJ's corresponding findings all comes from the same document. She claims that she has "trouble opening new jars," "problems doing heavy household chores," "problems carrying [her] groceries," and cannot "wash [her] back" or "do recreational things." (ECF No. 27, at 1.) While the plaintiff provides new information in disputing these findings – she "had to get . . . a grip pad" to open jars, for instance (*id.*) – I can only consider whether the Social Security record contains substantial evidence for the ALJ's determinations. And it does, in the "Occupational Therapy Discharge Summary" dated March 19, 2021. (R. 753–56.) The tasks in question all fall under the "QuickDASH Outcome Measure" used to gauge how successful the course of therapy was, and the language the ALJ quoted – "no difficulty" or "moderate difficulty," depending on the task in question – is quoted directly from that document. (*See* R. 18 ("At discharge [from occupational therapy] on March 19, 2021, the claimant . . . had 'no difficulty opening a tight or new jar, doing heavy household chores, [or] washing her back . . . and 'moderate difficulty' carrying a shopping bag . . . and engaging in recreational activities.") The ALJ's findings are therefore supported by substantial evidence in the record.

The plaintiff next argues that her "cervical, lumbar and thoracic [spine] are not normal at all" (ECF No. 27, at 1), disputing the ALJ's finding that "[x]-rays of the cervical and thoracic spine were normal." (R. 19.) The ALJ does not mention the plaintiff's lumbar spine on the page that she cites to. He noted that "x-rays of the lumbar spine on August 3, 2021[,] . . . revealed mild spondylitic changes with some endplate osteophytes" (R. 22), and determined that "degenerative disc disease of the lumbar spine" was a severe impairment. (R. 18.) For those reasons, I address only the ALJ's statements about x-rays of her cervical and thoracic spine. A report from the Day Kimball Hospital Department of Diagnostic Imaging reveals that four "radiographs of the cervical

spine were performed" on December 27, 2021, and revealed "[n]o acute cervical spine abnormality." (R. 1135.) Another report from that same date states that two "radiographs of the thoracic spine were performed" and that "[n]o acute osseous thoracic spine abnormality" or "significant degenerative disease" were detected. (R. 1136.) The ALJ therefore had substantial evidence for his findings regarding plaintiff's cervical and thoracic spine x-rays, and the plaintiff has not raised a persuasive challenge to the finding regarding her lumbar spine because she and the ALJ actually agree about what those x-rays showed.

When determining the plaintiff's RFC, the ALJ observed that she "alleged that she . . . could not use the left arm due to severe elbow pain" in the December 2020 Function Report. (R. 20.) The plaintiff argues in her motion that it is actually her "right shoulder down to just above [her] elbow." (ECF No. 27, at 2.) But in the report the ALJ cited to, she did indeed write that she "can't use left arm because of severe pain in elbow." (R. 396.) To be clear, this does not mean that the plaintiff, who knows her own symptoms better than anyone else, is now wrong about which of her arms hurts. But it does mean that there is substantial evidence to support what the ALJ said. The same goes for the ALJ's statement about the plaintiff's activities of daily living, when he indicates that she "spent a typical day getting up, showering and dressing, making coffee or tea, running errands, checking mail at the post office, and straightening up at home." (R. 20.) The plaintiff described her day in much the same terms in the December 2020 Function Report (R. 397), and she gave a substantially similar schedule in the September 2021 Function Report. (R. 420.) She did indicate in the later report that she also worked for Uber on a typical day (*id.*), but the ALJ acknowledged this later in his opinion. (*See* R. 21 ("In September 2021, the claimant reported doing some work for Uber.").) There is substantial evidence for the ALJ's description of the plaintiff's daily activities.

Regarding the plaintiff's claim that she "always ha[s] pain in [her] neck, shoulder and back" (ECF No. 27, at 2), the ALJ's opinion contains multiple references to these ailments. He acknowledges her claims that she "could not sit at a computer for more than 5 minutes without severe pain in the neck [and] low back" and "had . . . right shoulder . . . pain constantly." (R. 20.) He also observed that she "complained of persistent low back pain." (R. 21.) At no point in the opinion does the ALJ claim she uses "narcotics" and only notes that she "was advised to . . . take ibuprofen and a muscle relaxer." (ECF No. 27, at 2; R. 20.) Since the plaintiff's motion does not contradict what the ALJ said, I find that she has not persuasively challenged these findings.

The final factual finding that the plaintiff challenges is that she "reported increased low back pain after playing with her great grandson and carrying him up and down stairs" (R. 22), arguing that she only "carried him down one day." (ECF No. 27, at 2.) Her argument has support in the record, in a January 20, 2022 report from a visit with APRN Christine Donaruma, which indicates that the plaintiff "has been playing with the baby frequently, [and] carried him down the stairs yesterday." (R. 1149.) But on the next page, APRN Donaruma in the Assessment section specifically indicated that the plaintiff had been "playing with great grandson and carrying him up/down stairs." (R. 1150.) Again, while there is evidence to suggest she only carried her great grandson down the stairs, there is also relevant evidence that she carried him up *and* down the stairs, as the ALJ wrote. Even assuming that the distinction between "up and down" and merely "down" the stairs would have been significant, the ALJ's finding has evidence of substance to back it up, and therefore must be upheld.

Finally, the plaintiff takes issue with the ALJ's determination that her "statements about the intensity, persistence, and limiting effects of her symptoms . . . are inconsistent" and contends that her "pain is very real and it's every day." (*Id.* at 2.) But the ALJ accounted for this pain by

finding that she was only capable of sedentary work and in imposing additional limitations to account for her impairments. (R. 24–25.) And she implicitly concedes in her own motion that she is capable of sedentary work, acknowledging her "body can handle" driving for Uber and Lyft. (ECF No. 27, at 2.) Although the ALJ did not find that she had engaged in substantial gainful activity, he did consider the fact that statements about her "work activity" – for example, "driving 10,608 business miles in 2020 and 6,772 business miles in 2021" – were inconsistent with her "statements about the . . . limiting effects of her symptoms." (R. 22–23.) Here, the plaintiff's own statements are enough that a reasonable person could agree with the ALJ's conclusion, and thus constitute substantial evidence.

While the plaintiff disputes many of the factual findings at step two, she does not challenge the ALJ's conclusion that she suffers from two severe impairments. (ECF No. 27, at 1–2; R. 23–24.) And, so long as the ALJ finds at least one severe impairment and adequately considers the claimant's other impairments in determining her RFC, any error at step two would be harmless because it would not have any effect on the RFC determination. *Snyder v. Colvin*, No. 5:13-cv-585 GLS/ESH, 2014 WL 3107962, at *5 (N.D.N.Y. July 8, 2014) ("[W]hen an administrative law judge identifies some severe impairments at Step 2, and then proceeds through sequential evaluation on the basis of combined effects of all impairments, including those erroneously found to be non severe, an error in failing to identify all severe impairments at Step 2 is harmless."); *see also Reices-Colon v. Astrue*, 523 F. App'x 796, (2d Cir. 2013) (summary order) (holding that when the ALJ identifies "other severe impairments" and "subsequently consider[s]" other conditions at subsequent steps, "any error [is] harmless") (internal quotation marks omitted). And, to be clear, the Court does not find that plaintiff has alleged or that the ALJ committed such error.

Since there is substantial evidence for all of the ALJ's challenged findings and the plaintiff does not allege legal error, this Court should affirm the Commissioner's decision.

### III. CONCLUSION

For the reasons stated above, I recommend that the Plaintiff's motion for remand be **DENIED** and that the Commissioner's motion to affirm be **GRANTED**.

This is a recommended ruling by a Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(1). Any objections to this recommended ruling must be filed with the Clerk of the Court within nineteen (19) days of being served with this order. *See* Fed. R. Civ. P. 72(b)(2) (allowing fourteen days for objections); D. Conn. L. Civ. R. 72.2(a) (adding five days for litigants who, like the plaintiff in this case, will receive this recommended ruling by mail). Failure to object within nineteen (19) days will preclude appellate review. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; D. Conn. L. Civ. R. 72.2; *Impala v. United States Dep't of Justice*, 670 F. App'x 32 (2d Cir. 2016) (summary order) (failure to file timely objection to Magistrate Judge's recommended ruling will preclude further appeal to Second Circuit); *Small v. Sec'y of H.H.S.*, 892 F.2d 15 (2d Cir. 1989) (per curiam).

              */s/ Thomas O. Farrish*
              Hon. Thomas O. Farrish
              United States Magistrate Judge